UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| BOARDMAN STEEL FABRICATORS, LTD., | ) ) ) | Civil No. 14-2-GFVT |
| Plaintiff, | ) ) | **MEMORANDUM OPINION** |
| V. | ) ) | **&** |
| | ) | **ORDER** |
| ANDRITZ, INC., | ) ) | |
| Defendant. | ) ) | |

**\*\*\*   \*\*\*   \*\*\*   \*\*\***

The parties agree that a contract existed between them, and that Andritz failed to fully

pay for the goods and services they acquired under the contract.  The parties disagree only as

to whether Andritz is to be held legally accountable for its failure to pay.  Andritz contends

that there is no dispute of material fact on this point and has moved for summary judgment.

The motion has been fully briefed and the Court has heard the parties' arguments.  For the

reasons stated herein, summary judgment will be GRANTED.

**I**

Boardman Steel Fabricators does exactly what its name implies— it engineers,

fabricates and delivers steel.  [R. 1 at ¶ 1.]  On July 3, 2007, Boardman and Andritz entered

into a "Fabrication Contract" ("the contract) whereby Boardman agreed to design, engineer,

fabricate and supply steel for an annealing and pickling[1] line at the North American Stainless

---

[1]       *Annealing* is a process whereby steel is heated and then cooled.  By definition, *anneal* means "to
heat and then cool usu[ally] for softening and rendering less brittle."  *Webster's Third New International
Dictionary*  87 (2002)).  *Pickling* is a means of dipping annealed steel in acid to clean the steel of various
impurities that develop during the annealing process.  According to the dictionary, *pickle*, in the context of
Steel, is a process whereby "a bath of dilute sulfuric or nitric acid [is] used to cleanse or brighten the

(NAS) plant in Ghent, Kentucky.  [*Id*. at ¶ 2; R. 1-3.]  In exchange for Boardman's

performance, Andritz agreed to pay Boardman $4,700,000.[2]  [*Id*.]

As Boardman noted in the hearing, they cannot just pull steel off a shelf and ship it to

Andritz.  Instead, there is a great deal of design work that must be performed before

fabrication may even begin.  To assist them with this work, Boardman subcontracted, in July

2007, with Alliance Design (Alliance) to perform requisite "detail engineering" work.  [R. 19

at 4; R. 19-1 at ¶ 11 (Deibel Aff.).]  According to Boardman:

> Detailing involves taking a general layout of the steel structure provided by an outside
> structural engineer and creating detailed fabrication drawings showing the exact size
> and length of each steel beam and column, an exact depiction of each connection
> between all beams and columns, and an exact dimensioning of all pieces that make up
> the finished structure.

[R. 19 at 5.]  Boardman stresses this was no small job for Alliance, who spent 17,000 hours

completing its work.  [R. 19 at 5; R. 19-2 at ¶ 7 (Klusch Aff.)]

In anticipation of the possibility that Andritz's needs might change during the

execution of the contract, the parties included a provision in the contract outlining the

procedure for making such changes.  [*See* R. 1-3 at 6 (Section 6.1).]  Pursuant to this

provision, the parties entered into Change Order #3 on January 30, 2008, whereby Andritz

agreed to pay Boardman an additional $100,000 as "a good will gesture" for "additional costs

accrued by them as well as submitted to them by sub-suppliers."  [R. 17-8 (Change Order 3);

R. 19-1 at ¶ 17 (Deibel Aff.)]  The agreement also provided that Boardman would present

additional "change related documentation" to Andritz, and that Andritz would then review the

information and meet with Boardman about these additional costs.  The agreement explicitly

---

surface of castings or other articles of metal."  *Webster's Third New International Dictionary*  87 (2002)).
[2]     The total contract price was increased to $5,317,750 after the parties determined with more
exactness the amount of steel needed.  [*Id*. at ¶ 14.]

anticipated that:

> This meeting shall occur after Boardman and their subcontractors have finalized their contractual obligations towards Andritz Sundwig and independent of this agreement Boardman Steel Inc. herewith confirms and agrees to continue with and finish all required engineering work and to continue and finish all steel shipments to the job site without delay."

[R. 17-8 (Change Order 3).]  Following the entry of Change Order #3, Boardman began delivering steel to the project site.  [R. 19-1 at ¶ 18 (Deibel Aff.)]

On August 8, 2008, a little over a year after they had entered the contract, Boardman delivered its final load of fabricated steel to the worksite.  [R. 17-1 at 7; R. 17-10.]  As provided for in the contract, Boardman did not erect the steel, but was responsible for visiting the site "to determine in general if work is proceeding in accordance with the outlined plans." [R. 1-3 at 19; R. 19-1 at ¶ 18 (Deibel Aff.)]  Instead, NAS was responsible for contracting with another company to install and erect the structural steel.  [R. 1-3 at 31.]

After all the steel was erected, Boardman was also responsible for preparing *as-built* drawings, which are "a typical requirement of any design and fabrication contract so that all the changes made during construction can be documented."  [R. 1-3 at 3-; R. 19-1 at ¶¶ 19-20 (Deibel Aff.)]  These drawings were supposed to be provided 30 days following the final delivery, on April 15, 2008, but the drawings had still not been turned over as of the date of the parties hearing before this Court.  [R. 1-3 at 19; Hrg. Tr. at 30.]

Not able to come to an agreement on the *as-builts* and the additional charges associated with them, the parties met in July 2010 to hammer out a resolution.  Boardman represents that the meeting was called to "discuss[] the close-out of the Contract, which was a condition precedent to final payment."  [R. 19 at 6; R. 19-1 at ¶ 24 (Deibel Aff.).]  Andritz disagrees, as they believe the contract had already been fully performed at that time.  Instead,

they consider the July 2010 meeting to have been settlement discussions on those additional costs, and the *as-built* drawings.  [R. 22 at 14; Hrg Tr. at 28.]

On January 3, 2014, Boardman filed suit against Andritz, pleading a claim for breach of contract and, in the alternative, a claim for unjust enrichment or quantum meruit.  [R. 1 at ¶¶ 30-41.]  The parties agree that a contract for the sale of goods and services existed between them and Andritz admits that "[it] did not pay Boardman as required by the payment terms…" [R. 17-1 at 10.]  Andritz now moves for summary judgment on both counts, asserting that both claims were filed too late, in contravention of the applicable statutes of limitations.  [R. 17-1.]

## II

Summary judgment is appropriate where "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.' " *Olinger v. Corp. of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

In deciding a motion for summary judgment, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party.  *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001) (*citing Liberty Lobby*, 477 U.S. at 255).  In terms of burden shifting, the moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material

4

fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325. Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate there is a genuine issue. *Hall Holding*, 285 F.3d at 424 (*citing Celotex*, 477 U.S. at 324.) Moreover, "the nonmoving party must do more than show there is some metaphysical doubt as to the material fact. It must present significant probative evidence in support of its opposition to the motion for summary judgment." *Id.* (internal citations omitted).

The trial court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001) (*citing Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989)). Instead, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d at 655.

## A

Andritz argues that Boardman's breach of contract claim must fail because it is barred by the statute of limitations. Resolving this argument requires, first, determining what statute of limitations applies, and, second, determining the date of breach.

## 1

Whether the fabrication contract was primarily for the sale of goods or for the performance of services is a critical question because contracts primarily for the sale of goods are governed by the Uniform Commercial Code (UCC) and its four year statute of limitations,

whereas service contracts are governed by a much longer fifteen year statute of limitations. *See* KRS 355.2-725(1) (Under the UCC, "[a]n action for breach of any contract for sale must be commenced within four (4) years after the cause of action has accrued."); KRS 413.090 (contract for services subject to a fifteen year statute of limitations.)  Andritz argues that the contract was for steel and that the services rendered in fabricating that steel were merely incidental to the contract.  On the other hand, Boardman argues that the contract was predominately for services because of the significant design and engineering work that went into fabrication.

In Kentucky, the term "'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action." KRS 355.2-105(1).  In this case, the parties agree that the contract was for both goods and services.  In such a circumstance, Kentucky Courts apply the *predominant factor test* to determine whether the contract is primarily for goods or services:

> [W]hether or not Article II of the Code applies is determined by analyzing whether the predominant factor and purpose of the contract is the rendition of service, with goods incidentally involved, or whether the contract is for the sale of goods with labor incidentally involved.

*Wehr Constructors, Inc. v. Steel Fabricators, Inc.*, 769 S.W.2d 51, 54 (Ky. Ct. App. 1988) (citing *Allied Industrial Service Corp. v. Kasle Iron & Metals, Inc.,* 62 Ohio App.2d 144, 405 N.E.2d 307, 310 (1977));  *Jair United Inc. v. Inertial Airline Servs., Inc.*, 2013 WL 4048539, at *3 (W.D. Ky. 2013); *MidAmerican Distribution, Inc. v. Clarification Tech., Inc.*, 807 F. Supp. 2d 646, 666 (E.D. Ky. 2011) aff'd, 485 F. App'x 779 (6th Cir. 2012) ("[I]n Kentucky, '[t]he UCC applies to transactions in goods, including mixed contracts for goods and services where the predominant factor is the sale of goods.' ") (quoting *Marley Cooling Tower Co. v.*

6

*Caldwell Energy & Envtl., Inc.,* 280 F.Supp.2d 651, 659 (W.D. Ky.2003)).  Importantly, "the Uniform Commercial Code shall be liberally construed and applied to promote its underlying purposes and policies."  *See* KRS 355.1-103.

Factors to consider in performing the predominant factor analysis include the (1) language of the contract, (2) payment terms, (3) the mobility of the goods, and (4) the value of the goods and services, and (5) the business of the seller.  *BMC Indus., Inc. v. Barth Indus., Inc.,* 160 F.3d 1322 (11th Cir. 1998); *Fab-Tech, Inc. v. E.I. DuPont De Nemours & Co.*, 311 F. App'x 443, 445 (2d Cir. 2009) ("In determining the essential or predominant aspect of an agreement, courts typically look to several factors. Foremost among these are the language of the agreement itself and the circumstances of its making and performance."); *Spectro Alloys Corp. v. Fire Brick Engineers Co.*, 52 F. Supp. 3d 918, 925 (D. Minn. 2014);  *Cinetic Dyag Corp. v. Forte Automation Sys., Inc.*, 2008 WL 4858005, at *6 (E.D. Mich. 2008);  *Executone of Columbus, Inc. v. Inter-Tel, Inc.*, 665 F. Supp. 2d 899, 907 (S.D. Ohio 2009) (quoting *Heidtman Steel Products, Inc. v. Compuware Corporation,* 2000 WL 621144, *5 (N.D.Ohio 2000)).

**a**

As a preliminary matter, the parties disagree about whether or not this question should be answered by a jury.  The confusion hails from *C.J. Mahan Constr. Co. v. Valspar Corp.*, wherein the Sixth Circuit stated that "[w]here 'reasonable minds could reach different conclusions as to whether [the contract] was a predominately goods transaction or predominately a service transaction,' the question should be submitted to a jury."  30 F. App'x 381, 383 (6th Cir. 2002) (quoting *Urban Industries of Ohio, Inc. v. Tectum, Inc.,* 81 Ohio App.3d 768, 612 N.E.2d 382, 386 (1992)); *see also Downriver Internists v. Harris Corp.,* 929 F.2d 1147, 1151 (6th Cir. 1991) ("The district court properly let the jury decide whether this

7

particular contract was for goods or services."). In *C.J. Mahan,* 30 F. App'x 381, 383 (6th Cir. 2002), the Court was applying Ohio law and depended on an Ohio Court of Appeals case, *Urban Indus. of Ohio, Inc. v. Tectum, Inc.*, 81 Ohio App. 3d 768, 773, 612 N.E.2d 382, 386 (1992). In *Urban Industries*, the Court held that the question of whether a transaction was predominately for services or predominately for goods was a question of fact. 81 Ohio App. 3d 768 (citing 81 Ohio Jurisprudence 3d (1988), Sales and Exchanges of Personal Property, Section 15.) In *Downriver Internists*, the Sixth Circuit, applying Michigan law, deemed a jury was warranted because "genuine issues of material fact on the goods vs. services issue existed." 929 F.2d at 1151.

The Court has reviewed these cases, and is convinced that it would only be appropriate to send this question to a jury if material facts were in dispute. As stated by another district court in this circuit, "[a] jury . . . . should only resolve this issue if there is a true factual dispute, not if the division between goods and services merely involves a close call." *Mecanique C.N.C., Inc. v. Durr Envtl., Inc.*, 304 F. Supp. 2d 971, 976 (S.D. Ohio 2004); *see also Jair United Inc.,* 2013 WL 4048539, at *3 (same). In this case, there is no true factual dispute. Furthermore, district courts sitting in Kentucky have resolved this question without turning to a jury. *See Automated Cutting Technologies, Inc. v. BJS N. Am. E, Inc.*, No. 5:10-CV-208-REW, 2012 WL 2872823, at *3 (E.D. Ky. July 12, 2012); *Ferris v. Tennessee Log Homes, Inc.*, No. 4:06CV-35-M, 2009 WL 1506724, at *3 (W.D. Ky. May 27, 2009). The parties agree on the facts, and disagree only as to what effect those facts have. Accordingly, the question may be answered as a matter of law.

**b**

The language of the contract suggests that its main purpose was for the sale of goods,

with services being only incidental.  Boardman cites to a number of provisions in the contract that reference the services that it was to perform.  For example, the first page of the contract states that it is for "**DETAIL ENGINEERING, FABRICATION, MANUFACTUING, DELIVERY & OTHER SERVICES.**"  [R. 1-3 at 1 (emphasis in original); R. 19-1 at 13.] In Paragraph 7.4, it states that the "BUYER is relying on FABRICATOR'S expertise in design, planning, preparation and execution of the Work."  [R. 1-3 at 8.]  Exhibit A of the Contract goes into much greater detail about the services to be provided.  *See* R. 1-3 at 16-19. The fact that services were integral to the fabrication of the goods does little, however, to tell us whether goods or services predominate.  There are a number of reasons to believe, from the language of the contract, that it was predominately for the sale of goods.  First, the parties memorialized their agreement in a "Purchase Order."  [R. 17-2.]  The Eleventh Circuit has recognized that agreements utilizing this title are "most instructive" as that title is "almost exclusively used for transactions in goods."  *BMC Indus., Inc.*, 160 F.3d at 1331.  Second, the contract refers to Andritz as the "BUYER" and Boardman as the "FABRICATOR."  [R. 1-3 at 3.]  In the Purchase Order, Andritz is referred to as the "Buyer" while Boardman is referred to as either the "Seller" or the "Supplier."  [R. 17-2.]  Again, this language suggests a contract for the sale of goods.  *BMC Indus., Inc.*, 160 F.3d at 1331.  Third, the parties refer to the steel as "goods" throughout the contract.  [*See*, e.g. R. 1-3 at 5-6.]

The payment terms, a question separate from the value of the services, also suggest a contract for goods as the contract price was primarily calculated based on the costs of the steel, not the cost of services.  [R. 1-3 at 4 (Contract Price), 36 (Price List).]  One exception being that the price for "field assistance" was billed at $1,000 per day.  [R. 1-3 at 36.]  The significant cost of design services presents a separate question, but also weighs in Andritz's

favor.  The total contract price was $5,317,750.  [R. 1 at ¶ 14.]  While Boardman (in conjunction with Alliance) expended an additional, unanticipated $930,000 in detailing costs [R. 1 at ¶ 24], this additional expenditure does not change the fact that the majority of the project-cost was still in purchasing the fabricated steel.  Furthermore, these design costs were not anticipated at the time the parties entered the contract, and therefore cannot serve as evidence of its predominant purpose.  Finally, the design costs, while not insubstantial, are still a drop-in-the-bucket compared to the costs of the fabricated steel.  *But see Spectro Alloys Corp. v. Fire Brick Engineers Co.*, 52 F. Supp. 3d 918, 925 (D. Minn. 2014) ("The expensive cost of the materials—materials more expensive than the service—does not significantly change the result in this case.")

The goods were mobile.  They were fabricated off-site, and then subsequently shipped to Ghent, Kentucky, where they were to be erected by a contractor hired by NAS.  [R. 1-3 at 18 (Delivery Terms); R. 1-3 at 19 (Erection services to be performed by contractor hired by NAS).]  "Movable goods [are] another hallmark of a contract for goods rather than services.") *BMC Indus., Inc.*, 160 F.3d at 1330.

Finally, Boardman is in the business of fabricating steel, rather than the business of providing a service.  As noted in the hearing, they do perform some design services in-house, but here they sub-contracted with Alliance to perform the majority of design services.  [Hrg. Tr. at 7-9.]

Case law also supports the conclusion that the contract was predominately for goods.  Andritz contends that "[a]s a general rule, courts applying the predominant factor test to contracts for the fabrication and supply of steel have concluded that they are governed by the UCC."  [R. 17-1 at 11-12; R. 22 at 5.]  A review of Andritz's cited case law confirms this point. *See, e.g.*, *U.S. ex rel Bartec Indus., Inc. v. United Pac. Co.*, 976 F.2d 1274 (9th Cir. 1992)

(contract that involved both the fabrication and sale of steel and the provision of services was contract for goods); *Belmont Indus., Inc. v. Bechtel Corp.,* 425 F. Supp. 524, 528 (E.D. Pa. 1976) (Court found that UCC applied since the design services were only incidental to provision of structural steel that was to be used in the construction of facility); *U.S. Fid. & Guar. Co. v. N. Am. Steel Corp.*, 335 So.2d 18, 21 (Fla. App. 1976) (UCC applied to sale of fabricated steel pipe used to construct utility plant as the "predominate nature of the transaction was the furnishing of a product rather than services."); *Standard Structural Steel Co. v. Debron Corp*., 515 F. Supp. 803 (D. Conn. 1980) (contract to fabricate, detail and erect steel was for goods.); *Levinson Steel Co. v. Schiavone Constr. Co.*, 637 F. Supp. 164, 166 (S.D.N.Y. 1986) (UCC applied to contract to supply structural steel for subway); *Generations Ranch, LLC v. Zarbock*, 2012 WL 161814 (Az. App. Jan. 19, 2012) (mixed contract for barn components and installation services was predominately for goods); *Mecanique C.N.C., Inc. v. Durr Envtl., Inc*., 304 F.Supp.2d 971 (S.D. Ohio 2004) (subcontract for ductwork fabrication and installation was for sale of goods).

Boardman directs the Court to *Schenectady Steel Co. v. Bruno Trimpoli Gen. Const. Co.*, 350 N.Y.S.2d 920 <u>aff'd,</u> 316 N.E.2d 875 (1974), but that case is easily distinguishable. In *Schenectady Steel*, the Court held that the UCC did not apply because services predominated: "Upon an examination of the contractual terms, appellant was obligated to 'furnish and erect the structural steel', and the objective of the parties was, therefore, clearly to secure the erection of the structural steel for the bridge." *Id*. at 923. The Court found that the contract was not "simply for the steel beams but in essence for their erection and installation with the transfer of the title to the steel a mere incident of the overall transaction, a mere accessory to the work and labor to be performed." *Id*. (citations omitted). That is not this case; Boardman was not erecting the steel it fabricated.

11

In the end, some services are always performed incident to the production of goods. All widgets were designed, or engineered before they were produced.  The Court recognizes that the steel Boardman fabricated for Andritz is unlike a mass-produced widget, but the UCC accounts for such specialized, unique products, calling them "specially manufactured goods." The Court does not dispute Boardman's contention that many valuable services were performed incidental to the fabrication of steel, but it does not change the fact that these services were incidental.  Andritz contracted with Boardman because they wanted the finished product of fabricated steel.  This was the contract's predominate purpose, and therefore it is governed by the UCC, and its four year statute of limitations applies.

**2**

Having determined that the UCC applies, the Court must now consider the question of when Andritz's breach occurred.  Generally speaking, "[t]he obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract."  KRS 355.2-301.  The default rule is that "[p]ayment is due at the time and place at which the buyer is to receive the goods," but in this case the parties modified this requirement.  According to the contract, Andritz was to pay Boardman in installments with the final contract balance due no later than 120 days following "final delivery."  [R. 1-3 at 5 ("twenty percent (20%) of the total order value shall be retained for a period not to exceed 120 days after receipt of final delivery").]  The critical question is what constituted "final delivery?"

Andritz argues that "final delivery" occurred on August 8, 2008 when the last load of steel was delivered to the plant.  [R. 17-1 at 16.]  As evidence that the August 8 shipment was Boardman's "final delivery," Andritz notes that "about an hour after Boardman sent the shipping notice for the 'Last Truck Load,' it sent Andritz an invoice seeking payment for the remaining 20% of the Contract Price in the amount of $1,083,550.00."  [R. 17-1 at 7; R. 17-

11.]  Andritz understands this to mean that the contract balance was owed to Boardman no later than December 8, 2008 (120 days after August 8).  [R. 17-1 at 7.]  Andritz contends that on December 9, 2008, they were in breach of their agreement and, the statute of limitations began running.  [R. 17-1 at 17; R. 4 at 1-2 (Answer).]

Boardman does not dispute that it sent the August 8, 2008 invoice, but does take issue with this being construed as evidence of "final delivery."  Instead, Boardman argues that Change Order 3 modified the payment terms, and that "the phrase final delivery…was meant to apply to the final completion of Boardman's contractual services," which "includes, among other things, the completion and delivery of the as-built drawings." [R. 19 at 11; R. 19-1 at ¶¶ 16-17.]  In its brief Boardman asserts that "final delivery of [its] services accrued in July 2010" when the parties came to an agreement about furnishing the as-built drawings to Andritz.  [R. 19 at 7, 12.]  At the hearing, Boardman conceded that "final delivery . . . really hasn't occurred because the as-built drawings are a deliverable and it's a part of the contract and it's a requirement" and suggests the possibility that "the statute [of limitations] hasn't even begun to run yet…"  [Hrg. Tr. at 38.]

Contrary to its argument that summary judgment is inappropriate because there are questions of fact about when the breach occurred, Boardman has not directed the Court to any disputed material facts.  The disagreement is about what the phrase *final delivery* means, and this is a question of law.  In answering this question, the Court is cognizant that "[a] contract is interpreted by looking solely to the four corners of the agreement," *Smith v. Crimson Ridge Dev., LLC*, 410 S.W.3d 619, 621 (Ky. Ct. App. 2013) (citing *Baker v. Coombs,* 219 S.W.3d 204, 207 (Ky.App.2007)), and that "[u]nambiguous terms contained within the contract are interpreted in accordance with their ordinary meaning, 'without resort to extrinsic evidence.'"

13

*Id.* (quoting *Frear v. P.T.A. Indus., Inc.,* 103 S.W.3d 99, 106 (Ky.2003)).

Having reviewed the contract, the Court is led to believe that the term *delivery* was intended to refer specifically to the delivery of steel, and not to the delivery of the *as-built* drawings.  First, in the section titled "Scope of Fabrication Services," the contract contained two different sections discussing the "Delivery" of "materials to the job site" and the preparation of "As-Build Drawings."  [R. 1-3 at 18.]  Andritz points out that, in the "Delivery" section there are no references to the *as-builts*.  Instead, references are made to "Deliver[ing] [ ] all material to the job site" and it is noted that the "objective [of the delivery] is to unload the steel from the trailer…"  [*Id.*]  The "As-Build" section notes Boardman's agreement to "[p]repare a set of as-built drawings," but it fails to provide any reference to these drawings being "delivered." [*Id.*]  Second, the contract establishes two separate schedules for the delivery of steel and for the delivery of documents.  [*Id.* at 17, 19.]  Four different delivery dates were provided for the steel, with the first being on January 2, 2008 and the last being on March 15, 2008.  [R. 1-3 at 17.]  In a note below the schedule it provides that "In [*sic*] average an [*sic*] delivery of 200 tons per week shall be guaranteed."  [*Id.*]  The separate schedule addressing "Documentation Deliverables" provides that the *as-builts* were due by April 15, 2008—one month after the parties intended to deliver the last load of steel and inside the 120-day window for *final payment* (if one presumes *final delivery* was referring to the final steel delivery).  [R. 1-3 at 19.]  Third, the contract distinguishes between the "delivery of all goods" and the "performance of all services," suggesting that goods (i.e. steel) are delivered while services (i.e. *as builts*) are performed.  [R. 1-3 at 5.]  This adds credence to the argument that *delivery* referred to goods.  Finally, contrary to Boardman's arguments, the Court fails to see how Change Order 3 had any effect on what constituted *final delivery*.

14

Furthermore, the language contained in Change Order 3 suggests that the *as-builts* were not a pre-requisite of final delivery.  In the Change Order, the parties agreed that they would meet *after* Boardman "finalized their contractual obligations towards Andritz."[3] [R. 17-8.]  It is undisputed that the *as-builts* were not finalized at the time of the July 2010 meeting, suggesting that they were not a prerequisite to finalizing "contractual obligations."

The Court is satisfied that the contract itself establishes that *final delivery* referred to the final delivery of steel, but even if the Court found the contract to be ambiguous, then the parties other actions also support this position.  Under Kentucky law, when a Court finds a contract to be ambiguous, it applies the doctrine of contemporaneous construction.  *A.L. Pickens Co., Inc. v. Youngstown Sheet & Tube Co.,* 650 F.2d 118, 120 (6th Cir. 1981). According to that doctrine, "courts are required to give great weight to the interpretation which the parties have placed upon an ambiguous contract. The construction of the parties is best evidenced by their conduct with respect to the agreement." *Id.* (quoting *Billips v. Hughes,* 259 S.W.2d 6, 7 (Ky.1953)).  Thus, the Court must examine "the course of performance engaged in by the parties to the contract." *Id.*  As discussed *supra*, "about an hour after Boardman sent the shipping notice for the 'Last Truck Load,' it sent Andritz an invoice seeking payment for the remaining 20% of the Contract Price in the amount of $1,083,550.00." [R. 17-1 at 7; R. 17-11 (July 2008 Invoice).]  Had it not believed this last truckload to constitute "final delivery," then why did it send a bill for the retainage and why

---

[3]      "Boardman Steel Inc. will begin collecting all change related documentation and present that documentation to Andritz Sundwig.  As soon as Andritz Sundwig has the opportunity to review that information they will make themselves available for review meetings at Boardman Steel inc. offices. **This meeting shall occur after Boardman and their subcontractors have finalized their contractual obligations towards Andritz Sundwig** and independent of this agreement Boardman Steel Inc. herewith confirms and agrees to continue with and finish all required engineering work and to continue and finish all steel shipments to the job site without delay." [R. 17-8 (Change Order 3).]

would Boardman's President have told Andritz's project manager that he "hoped he would not have to wait 120 days for payment"?  [*See* R. 22-1 at ¶ 4 (Waelchli Affidavit).]  The invoice noted "Extras to Follow" – suggesting that any outstanding "Extras" were to be dealt with within the "period not to exceed 120 days after" final delivery.  [R. 1-3 at 5; R. 17-11 at 2 (Invoice).]

Finally, Boardman's argument that its cause of action "accrued" in July 2010 is faulty.  As noted at the hearing, the *as-builts* still had not been delivered as of the July 2010 meetings.  [Hrg. Tr. at 30.]  All that happened in July 2010 is Boardman became aware of the fact that Andritz did not intend to pay.  [*See* R. 19 at 10 (Boardman "did not know, and had no reason to know, that Andritz had no intention of paying Boardman for its additional costs until July 2010 when the parties met to discuss final payment.")]  When Boardman knew or had reason to know of the breach is irrelevant because, "[a] cause of action accrues when the breach occurs, **regardless of the aggrieved party's lack of knowledge of the breach**." KRS 355.2-725(2) (emphasis added).  The cause of action either accrued on December 9, 2008 when Andritz failed to pay, or the cause of action has not yet accrued, but there is no reason to conclude that anything accrued in July 2010.

Boardman's suggestion that *final delivery* has still not occurred and the cause of action still had not accrued is also not persuasive.  To find that *final delivery* was contingent on Boardman's decision to release the *as-builts* would be to put Boardman in control of when Andritz was allowed to sue them.  By this logic, Boardman could extend the statute of limitations "into infinity" if they continued to hold on to the *as-builts.*

Both the contract's language and the parties conduct confirms that "final delivery" referred to the last shipment of fabricated steel.  This occurred on August 8, 2008.  The

contract gave Andritz 120 days after it received that delivery to pay, meaning that the contract balance was owed to Boardman no later than December 8, 2008.  Andritz was in breach on December 9, and Boardman could have sued at that point, although the statute of limitations gave Boardman four years to sue.  This suit was filed on January 3, 2014 – over five years after the breach, and over a year too late under the UCC's governing four-year statute of limitations.

**B**

As an alternative to recovering on the contract, Boardman further pled an unjust enrichment/quantum meruit claim.  As explained in the Court's prior opinion denying Andritz's motion to dismiss these claims, Boardman was entitled to plead these equitable claims as an alternative means of relief.  [R. 14.]

Unfortunately for Boardman, these claims are also time-barred.  In its complaint Boardman pled that it is entitled to "[t]he reasonable value of the labor and material actual furnished by Boardman to Andritz, less payments made by Andritz to date, is in excess of $2,500,000, for which Andritz has failed and refused to pay Boardman."  [R. 1 at 7.] Accordingly, the cause of action on these claims would have accrued on the same date as the cause of action on the breach of contract claim.  In Kentucky, equitable actions like the one brought here are governed by a five year statute of limitations.  *See* KRS 413.120. Accordingly, this claim was also brought out of time.

**III**

This case is unusual in that the Andritz openly admits it breached its agreement with Boardman.  It is not without hesitation that the Court grants summary judgment in Andritz's favor, but statutes of limitations exist to encourage Plaintiffs to vindicate their rights in a

17

timely manner and when a Plaintiff sits on his rights too long he loses those rights.  Boardman admits that it should have filed this suit sooner and, perhaps next time it will do so.

For all the reasons stated herein, and the Court being sufficiently advised, it is hereby **ORDERED** that Andritz's Motion for Summary Judgment [R. 17] is **GRANTED**.

This 9th day of September, 2015.

Signed By:

*Gregory F. Van Tatenhove*

**United States District Judge**